IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.:

**HELENE AGBO,**

       Plaintiff,

v.

**MCB CLINICAL RESEARCH CENTERS, LLC**, a Colorado Limited Liability Corporation; **BRIGITTE KLAIB; ALEXANDER KLAIB, KRISTIN SCALVA** and **CHRISTOPHER SCALVA**,

       Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff, Helene Agbo, by and through her attorneys, Kiovsky | DuWaldt LLC and Nixon Shefrin Hensen Ogburn P.C., brings the following complaint against Defendants.

## PRELIMINARY STATEMENT

1.      Plaintiff, Helene Agbo, was employed by Defendant MCB Clinical Research Centers, LLC ("MCB") from January 2011 through August 11, 2016 as a Clinical Research Coordinator.  She is seeking redress for wage and hour, retaliation, trafficking, civil rights and contract violations she suffered while working for MCB.  Plaintiff is a citizen of Cote D'Ivoire (Ivory Coast) and was recruited by Defendants to move to Colorado from California where she was a student, to work for Defendant MCB.  Defendants required Plaintiff by intimidation and threat of deportation to work thousands of hours without pay or benefits, failed to pay her the wages required by law and contract, discriminated against her on the basis of her race, national origin and disability and retaliated against her by firing her and withdrawing her visa when she complained about Defendants' abuse and unlawful acts.

1

**JURISDICTION AND VENUE**

2.      This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1331 (federal question), 29 U.S.C. § 201 *et seq.* (Fair Labor Standards Act "FLSA"), 18 U.S.C. § 1589, § 1595 (Trafficking Victims Protection Reauthorization Act "TVPRA"), 42 U.S.C. § 1981 *et seq.* (Civil Rights Act of 1966 "Section 1981"), and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's Colorado statutory and common law claims.

3.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), as the events or omissions giving rise to the claims occurred in the District of Colorado.

**PARTIES**

4.      Plaintiff, Helene Agbo, is a citizen of the Cote D'Ivoire (Ivory Coast) residing in Colorado Springs, Colorado.

5.      Defendant, MCB is a Colorado Limited Liability Company with its principal place of business in Colorado Springs, Colorado.

6.      Defendant, Brigitte Klaib, is the sole member of MCB and is an individual residing in Colorado.

7.      Defendant, Alexander Klaib, is an individual residing in Colorado.  He is married to Defendant, Brigitte Klaib and was employed by Defendant MCB.

8.      Defendant, Kristin Scalva, is the President of MCB and is an individual residing in Colorado.  She is the daughter of Defendants Brigitte and Alexander Klaib.

9.      Defendant, Christopher Scalva, is the Vice President of MCB and is an individual residing in Colorado.  He is married to Defendant, Kristin Scalva.

## BACKGROUND

10.     Plaintiff fled the Ivory Coast, where there have been decades of civil war and strife, in January 2007, entering the United States as a student to study in California under an F-1 student visa.

11.     Plaintiff obtained her Master's degree in Public Health from San Jose State University in 2010.

12.     While in school in California, Plaintiff rented a room from Defendant Brigitte Klaib's father.

13.     Following her graduation, Defendant Brigitte Klaib's father told Plaintiff that his daughter and son-in-law owned a clinical research center in Colorado Springs, Colorado.  He introduced Plaintiff to Defendants Brigitte and Alexander Klaib, the owners of Defendant MCB.

14.     In December 2010, Plaintiff and her husband traveled to Sacramento, California to meet Defendants Brigitte and Alexander Klaib.

15.     To induce Plaintiff to move to Colorado from California and accept employment with MCB, Defendants Brigitte and Alexander Klaib (on behalf of themselves and MCB) promised that if Plaintiff came to work for MCB, MCB would sponsor her H-1B visa and later her Green Card.

16.     In reliance on the MCB's and the Klaibs' promises, Plaintiff moved to Colorado in January 2011, and began working for MCB and lived with the Klaibs.

17.     Plaintiff was initially authorized to work for Defendants in the United States on a one-year training extension of her student visa.

18.     In January 2011, Plaintiff worked an average of 5-6 hours per day for MCB.

19.     At the end of January 2011, MCB paid Plaintiff approximately $600 for her first two weeks work.

20.     In February 2011, MCB began the process of applying for an H-1B visa to permit Plaintiff to work in the United States for MCB.

21.     The H-1B nonimmigrant visa allows temporary employment of foreign workers in specialty occupations. These jobs require "theoretical and practical application of a body of highly specialized knowledge, along with at least a bachelor's degree or its equivalent in the specialization."

22.     The employer begins the process by filing a Labor Condition Application ("LCA") with the U.S. Department of Labor ("USDOL") that details the job type, length, location, salary and other terms and conditions of employment.

23.     The salary paid to an H-1B worker must be the greater of either the actual wage paid to similarly situated U.S. workers or the prevailing wage determined by USDOL's surveys of the industry.

24.     Employers are prohibited from offering lesser benefits to H-1B workers than to other similarly situated employees.

25.     The law requires the employer to pay all costs of obtaining the H-1B visa, including filing fees and attorney fees and prohibits an employer from requiring reimbursement from the employee.

26.     Defendants Brigitte and Alexander Klaib told Plaintiff she should not have any contact with the attorney preparing the H-1B visa application.

27.     Shortly after beginning the application process, Defendants Brigitte and Alexander Klaib told Plaintiff that they had not been aware how expensive obtaining the visa would be.

They refused to pay Plaintiff for the work she had done after the initial $600 payment and told her they would apply her pay toward the attorneys' fees and other expenses they paid associated with the H-1B visa and the expenses they anticipated for Plaintiff's Green Card application.

28.     Plaintiff was unaware that the law required the employer to pay the costs and fees associated with obtaining the H-1B visa and Green Card.

29.     By this time, Plaintiff had become financially dependent on the Klaibs as she was in a new city and state where she knew no one else, had no money, and had not been paid for weeks.  Moreover, she had come to trust the Klaibs and believed they would treat her as family, be truthful with her and keep their promises.

30.     Consequently, Plaintiff did not question the Klaibs when they told her she was required to pay the costs of the visa and that they would apply her pay toward her visa and Green Card costs.

31.     A month or two later, Defendants Brigitte and Alexander Klaib told Plaintiff that their attorney told them that based on Plaintiff's skills and qualifications they would be required to pay her between $75,000 and $90,000 (the "prevailing wage") and they could not afford to pay her that much money.

32.     Defendants Alexander and Brigitte Klaib told Plaintiff that they would say in the visa application that she was working part time, but that she would in fact be required to work full time.

33.     Defendants Alexander and Brigitte Klaib also again promised Plaintiff that they would apply for her Green Card if she actually worked full-time even though they were stating "on paper" that she was part-time.

34.     Defendant Brigitte Klaib submitted an LCA to the USDOL in which she certified that the prevailing wage for a Medical Research Study Coordinator was $38.40 per hour and agreed that MCB would pay Plaintiff $38.40 per hour during the term of the H-1B visa from October 1, 2011 through September 30, 2014.

35.     In the 2011 LCA, Defendants Brigitte Klaib and MCB falsely represented that Plaintiff would work part-time.

36.     Defendant Brigitte Klaib signed the 2011 LCA on behalf of Defendant MCB, and attested that all of the statements in the labor certification were true and that she and MCB would comply with the employment terms set forth in the LCA.

37.     The compensation terms contained in the LCA constitute a binding contract.

38.     Plaintiff is a third-party beneficiary of the LCA.

39.     Plaintiff was not given a copy of the LCA and was unaware of its terms until 2017.

40.     Plaintiff continued to live with the Klaibs and at their insistence and direction she worked for MCB 4-6 hours per day, five days per week from February through May 2011.

41.     MCB did not pay Plaintiff for any of the hours she worked from February through May 2011.

42.     Plaintiff also took various training classes at the Klaibs' direction during 2011. These training classes were required MCB and were directly related to her job.

43.     MCB was required to pay Plaintiff for the time she spent in these training classes.

44.     MCB did not pay Plaintiff for the time she spent in training.

45.     In May 2011, Plaintiff began working between 8 and 10 hours per day for MCB, at the MCB office, at the MCB clinic, at Penrose Hospital and often at home.

46.     MCB did not pay Plaintiff for any of the time she worked from June 2011 through October 2011.

47.     In addition to working directly with the Klaibs, Plaintiff's work was supervised by Defendants Kristin and Christopher Scalva.  All Defendants were fully aware that Plaintiff was working for MCB from February through October 2011 and were aware that Plaintiff was working full-time after May 2011.

48.     MCB's application for an H-1B visa was granted, authorizing Plaintiff to work in the United States for MCB from October 1, 2011 through September 30, 2014.

49.     Defendants gave the original 2011 visa to Plaintiff as they are required to do by law.

50.     During her employment, Defendant Kristin Scalva told Plaintiff on several occasions that her unpaid wages and raises were being applied to the costs of obtaining her H-1B visa and Green Card.

51.     Defendants Brigitte Klaib and Alexander Klaib isolated Plaintiff by warning Plaintiff not to talk to others about the particulars of her employment.  Defendant Alexander Klaib even told Plaintiff not to talk to her own children about her job as he was concerned they might talk to their teachers or friends.

52.     Plaintiff was given a copy of the MCB Personnel Manual and signed it on October 15, 2013.

53.     The MCB Personnel Manual does not state that employees are at will and does not contain any language indicating that the Personnel Manual was not intended to be a contract.

54.     The MCB Personnel Manual provides that employees who are regularly scheduled to work 40 hours per week are considered full-time employees and are eligible for all employee benefits.

55.     Plaintiff was regularly scheduled to work 40 hours per week and worked full time throughout her employment. She frequently worked in excess of 40 hours per week on the clock and also frequently worked many hours off the clock from home and in the office, clinic and hospital.

56.     In 2011, MCB paid Plaintiff a total of $9,150.

57.     The amount paid by MCB to Plaintiff in 2011 represents payment for 238.28 hours at $38.40 per hour.

58.     In actuality, Plaintiff worked approximately 1700 hours for MCB in 2011.  She was not compensated for at least 1,462 hours of work.

59.     In 2012, Defendants MCB and Brigitte Klaib also sponsored H-4 visas for Plaintiff's minor children.  These visas permit the minor children of H-1B workers to stay in the United States as long as the H-1B visa is valid.  These visas gave Defendants additional leverage over Plaintiff, permitting them to obtain additional uncompensated labor from Plaintiff because her children would be deported if she lost her job.

60.     In 2012 and 2013, MCB paid Plaintiff a total of $40,560 per year.

61.     The amount paid by MCB to Plaintiff in 2012 and 2013 represents payment for 1,056.25 hours per year at $38.40 per hour.

62.     In actuality, Plaintiff worked at least 2080 hours per year for MCB in 2012 and 2013.  She was not compensated for more than 2,047.5 hours in 2012 and 2013.

63.     At the end of each year during employee evaluations, Defendant Kristin Scalva told Plaintiff that she worked hard and performed well, but couldn't have a raise because the money would instead be applied to the cost of sponsoring her Green Card.  Defendant Kristin Scalva told Plaintiff several times that the Green Card would cost approximately $100,000.

64.     Plaintiff believed Defendant Kristin Scalva when she told her these things.

65.     In 2013 Plaintiff applied to nursing school and was accepted.  She started school in Summer 2013 but continued to work full time, taking time out for classes during the day and coming back to work in the evening.

66.     In 2014, MCB installed a time clock.  Plaintiff was told the time clock was installed because MCB did not feel she was working enough hours.  Plaintiff retained copies of her time records which confirm that she was working full time.

67.     In 2014, Defendant Brigitte Klaib told Plaintiff she was going to start the application process to sponsor her Green Card.  Ms. Klaib told Plaintiff they had to prove there were no U.S. citizens as qualified for the position as Plaintiff and felt that would be easy because Plaintiff held advanced degrees and was bilingual.

68.     However, Ms. Klaib said she had been told by MCB's attorney that once the Green Card application was submitted, Plaintiff had to work full-time and could no longer be classified as a part-time employee.  Ms. Klaib said that the attorney told her that the government would closely monitor what MCB was paying her.  Ms. Klaib said they would have to come up with an alternative way to pay Plaintiff lower wages than were required by law.

69.     Defendant Brigitte Klaib suggested a scheme in which MCB would pay Plaintiff the full-time salary required by the LCA, and that Plaintiff would pay half of that salary back to MCB through a special bank account.

70.    Defendant Alexander Klaib suggested other illegal and/or inappropriate schemes to Plaintiff to obtain a Green Card, such as marrying a U.S. citizen even though she was already married, convincing someone to adopt her, or paying a judge or someone who worked for a judge to get a Green Card.  Plaintiff rejected these suggestions.

71.    Shortly thereafter, Defendants Brigitte Klaib and Alexander Klaib broke their promises to sponsor Plaintiff's Green Card because they said they were told by their attorney that the government would closely monitor what they were paying Plaintiff during the Green Card process and they "didn't want to go to jail."

72.    The Klaibs told Plaintiff they needed Plaintiff to keep working full-time for part-time wages and that they were unwilling to begin the Green Card process.

73.    Alexander Klaib questioned Plaintiff as to how she planned to pay back the money spent on her visas and told Plaintiff to ask her husband to send money from the Ivory Coast to reimburse the costs of her H-1B visa.  When Mr. Klaib did this, Plaintiff reminded him that she had worked for months without pay in 2011 to pay back the debt.

74.    Plaintiff, who until this time, had been afraid to complain about her situation said she didn't think she should have to continue to work full-time and not be paid for it.

75.    Defendants continued to insist that Plaintiff work full-time and made it clear that her job would be in jeopardy if she did not.  Plaintiff, afraid of losing her job and her visa, which would result in her and her children's deportation, reluctantly complied.

76.    In mid-2014, Defendant Brigitte Klaib and MCB began the process of renewing Plaintiff's H-1B visa.

77.    On June 12, 2014, MCB's attorney sent a letter to Defendant Brigitte Klaib enclosing for Ms. Klaib's signature documents necessary for the H-1B renewal petition for

Plaintiff.  The letter enclosed, among other documents, the Employer Letter and Summary Offer of Temporary Employment and the Labor Certification.

78.    Plaintiff was not copied on the letter.

79.    Defendant Brigitte Klaib, on behalf of Defendant MCB, signed and submitted the 2014 LCA certifying that Plaintiff would be paid a wage of $38.40 per hour and that Plaintiff was working part-time.

80.    Ms. Klaib and MCB made these representations knowing they were untrue.

81.    Ms. Klaib and MCB made these representations with no intention of complying with the conditions of the LCA and they did not comply with these conditions.

82.    Plaintiff's H-1B visa was approved for the period October 1, 2014 through September 30, 2017.  MCB's attorney sent a copy of the visa to Defendant Brigitte Klaib and Plaintiff and sent the original to Defendant Brigitte Klaib.

83.    Although Defendant Brigitte Klaib clearly knew she was obligated to provide the original visa to Plaintiff because she had done so in 2011, she and Defendant Alexander Klaib withheld the original visa from Plaintiff and held it.

84.    Plaintiff waited for almost three weeks for Defendants to give her original visa to her and they did not provide it.

85.    Plaintiff needed her original visa for an appointment and complained to one of her coworkers that Defendants had not given it to her.  Plaintiff sat in an open cubicle and Plaintiff believes Defendants were able to hear her conversation.

86.    Defendants Alexander and Brigitte Klaib called Plaintiff into their office and yelled at her for talking to her coworker.  Plaintiff said she was upset that they didn't give her visa

to her.  Defendant Alex Klaib said "you are talking too much, don't talk to anyone, just do your job."

87.     Defendants did ultimately give Plaintiff her original visa but Defendant Brigitte Klaib warned Plaintiff that if MCB fired her she would never get a job in the United States and would be deported.  She said: "We don't like betrayals."

88.     Plaintiff was afraid that Defendants would fire her if she continued to complain and therefore reluctantly she dropped the matter.

89.     In 2014, MCB paid Plaintiff $45,781.00.

90.     The amount paid by MCB to Plaintiff in 2014 represents payment for 1,192.21 hours of work at $38.40 per hour.

91.     In actuality, Plaintiff worked at least 2080 hours for MCB in 2014 and was not compensated for at least 887.79 hours.

92.     In 2015, MCB paid Plaintiff $47,462.00.

93.     The amount paid by MCB to Plaintiff in 2015 represents payment for 1,236 hours of work at $38.40 per hour.

94.     In actuality, Plaintiff worked significantly more than 1,236 hours for MCB in 2015 and was not compensated for hundreds of hours of work.

95.     In 2016 MCB paid Plaintiff $9,792.50.

96.     The amount paid by MCB to Plaintiff in 2016 represents payment for 255 hours of work at $38.50 per hour.

97.     In actuality, Plaintiff worked significantly more than 255 hours in 2016 and was not paid for many hours of work.

98.     MCB never paid Plaintiff time-and-a-half for any hours worked in excess of 40.

99.     In 2015, Plaintiff was diagnosed with a rare and serious form of cancer.  A large tumor had infiltrated her kidneys, uterus and blood vessels in her left leg, requiring a number of procedures to stabilize her and an aggressive and invasive surgery in mid-January 2016.

100.     Following surgery, Plaintiff underwent additional treatment for her cancer and a rigorous physical therapy regime to address the extensive nerve damage to her leg from surgery that impeded her ability to walk.  Nevertheless, she regularly communicated with Defendants about her condition.

101.     Approximately a month after her surgery, Defendants Kristin and Christopher Scalva and Brigitte Klaib asked Plaintiff to work from home to prepare research binders for an upcoming presentation.  Plaintiff complied under pressure and out of fear that she would be fired if she declined.

102.     On February 9, 2016, Plaintiff's physician sent a letter which was delivered to MCB by Plaintiff's son, stating that Plaintiff has been under his care and unable to work since she had surgery on January 14, 2016.  Plaintiff's physician indicated that she is not yet cleared to return to work and that he would see her for a follow-up appointment in three months.

103.     Less than three months later, on April 25, 2016, Defendant Christopher Scalva sent an email to Plaintiff stating "We wanted to check in as we have not heard from you in a while. Last we heard you were to have a follow up appt with you [sic] doctor in early May and I wanted to see if that was still the plan? Ultimately, we are wanting to get a status update on your health so we can appropriately plan staffing for your eventual return.  Any update would be appreciated as we need to be up to date on your health status for eventual return."

104.     Following her doctor's appointment, Plaintiff emailed Mr. Scalva a letter on May 23, 2016, which had been sent to her by her physician a few days earlier stating that Plaintiff has

been under his care and unable to work since January 2016.  Plaintiff's physician indicated that she had complications from surgery and may be able return to work in August.  He further indicated that she would need to have light duty work due to the nerve injury in her leg.

105.    Defendants did not tell Plaintiff that they were unwilling to grant her the additional time off.

106.    On June 20, 2016 Defendant Kristin Scalva sent an email to Plaintiff confirming that she knew Plaintiff would be out of work until at least August and offering to bring her dinner.

107.    The next day, June 21, 2016, Plaintiff responded to Ms. Scalva thanking her for checking on her and indicating that there was no need for her to bring dinner as she had been going to the soup kitchen since her paycheck was cut off.

108.    Ms. Scalva responded more than a month later, on July 27, 2016, stating "sorry about the delay in getting back to you and asking "do you know what day you'll be back?"

109.    Plaintiff responded on August 1, 2016 informing Ms. Scalva that "I have a doctor appointment this week and also an MRI.  After the visit the doctor will be able to tell me exactly when I can go back to work and how much I can work I am planning to come next Monday to MCB to meet with you ALL and discuss the future."

110.    During her illness, Plaintiff had decided that she when she returned, she would object to Defendants' treatment of her and request that she be treated lawfully and equally to her coworkers.

111.    Ms. Scalva and Plaintiff agreed that they and Mr. Scalva would meet at 2:00 p.m. on August 10, 2016.

112.    Plaintiff was not yet permitted to drive and she asked a friend, Allison Curtis, to drive her and to attend the meeting with her for support.

113.    On August 3, 2016, Plaintiff's physician provided a letter which Plaintiff delivered to Defendant Kristin Scalva when they met on August 10, 2016, stating that Plaintiff has been under his care and unable to work from January 2016 through September 2016.  Plaintiff's physician indicated that she may return to work in early October.

114.    When Plaintiff and Ms. Curtis arrived at MCB's office at the scheduled time on August 10, 2016, no one was ready to meet with her.  Finally, Ms. Scalva appeared alone for the meeting.

115.    The only people in the meeting were Plaintiff, Ms. Curtis and Ms. Scalva.

116.    Plaintiff told Ms. Scalva she wanted to return to work but felt MCB had mistreated her and asked to be treated the same as other employees when she returned to work, including but not limited to being paid for all the time she worked and not receiving overtime or  employee benefits.  Plaintiff also complained to Ms. Scalva that Defendants had withheld wages to cover the cost of applying for her H-1B visa and Green Card and had lied to her and breached their promises to sponsor her Green Card.

117.    When it became obvious that Defendant Kristin Scalva was not receptive to Plaintiff's concerns, Plaintiff and Ms. Curtis left the office.

118.    In immediate retaliation because Plaintiff asserted her rights, complained about mistreatment and demanded that Defendants comply with the law, Defendant Brigitte Klaib sent Plaintiff an email terminating her employment the next day, August 11, 2016.

119.    Ms. Klaib gave two reasons for MCB's decision to terminate her employment:  (1) "the inability to reach you.  You do not return phone calls, emails or texts on a consistent basis. We are unable to communicate with you.  I have tried numerous times to call you, sometimes you answer and hang up other times it goes straight to voice mail. (2) you requested a meeting with

our company president, arrived with a guest and proceeded to make false accusations as to the work environment.  Demanding that we get you a US Green Card along with other demands.  The negativity that you portrayed is not acceptable in our work environment."

120.    Ms. Klaib told Plaintiff in her August 11, 2016 email that she would contact the immigration authorities that day to inform them that she was no longer working for MCB and that she was required by law to leave the country.

121.    Defendant Brigitte Klaib and MCB took these actions with malice, knowing that Plaintiff's health was at risk and that she was in continuing need of medical treatment and that her children could also be deported.

122.    Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission and the Colorado Civil Rights Division alleging discrimination on the basis of race, national origin and disability.  On April 18, 2019, Plaintiff was issued a right to sue letter giving her 90 days after receipt of the letter to file suit.  This lawsuit was timely filed.

**FIRST CLAIM FOR RELIEF**
**(TVPRA, 18 U.S.C. §§ 1589, 1595(a))**
**Against all Defendants**

123.    Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs of this Complaint.

124.    The forced labor provision of the TVPRA, 18 U.S.C. § 1589, makes it unlawful to knowingly provide or obtain the labor or services of a person by any one of, or by any combination of, the following means:

     a.   by means of force, threats of force, physical restraint, or threats of

        physical restraint to that person or another person;

     b.   by means of serious harm or threats of serious harm to that person or

another person;

c.  by means of the abuse or threatened abuse of law or legal process; or

d.  by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint. 18 U.S.C. § 1589.

125.    In violation of the forced labor provisions of the TVPRA Defendants, acting in concert,  knowingly provided or obtained Plaintiff's labor and services by means of threats of serious harm; threatened abuses of law or legal process; and by engaging in a scheme, plan, or pattern intended to cause Plaintiff to believe that, if she did not perform such labor or services, that she would suffer serious harm.

126.    Specifically, Defendants compelled Plaintiff to engage in forced labor by abusing the legal process and threatening Plaintiff with loss of her job and H-1B visa and deportation of her and her children if she refused to continue to work many hours without pay and benefits or if she discussed their actions with her coworkers, by isolating and demeaning her and by telling her she had to repay Defendants for the money they spent to obtain her H-1B visa and sponsor her Green Card.

127.    Defendants further abused the legal process by withholding Plaintiff's visa and failing to provide her with a copy of the LCA and other related documents specifying the wages they agreed to pay and other working conditions.

128.    Each Defendant participated in this scheme and, knowingly or in reckless disregard of the facts, benefited financially from their participation the venture.

129.    As a result of Defendants' actions, Plaintiff has suffered damages to be proven at trial.

### SECOND CLAIM FOR RELIEF
**(Retaliation Under the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3) *et seq.*)**
**Against Defendants MCB, Kristin Scalva and Brigitte Klaib**

130.    Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs of this Complaint.

131.    All Defendants are "employers" as defined by the Fair Labor Standards Act.

132.    On August 10, 2016, Plaintiff engaged in protected activity when she complained to Defendant Kristin Scalva that MCB had failed to pay her properly, including failing to pay her at least minimum wage for time worked in 2011, failed to pay for thousands of hours worked in 2012-2016 and had failed to her pay time and a half for hours worked in excess of 40 per week.

133.    Defendants immediately retaliated against Plaintiff by terminating her employment and reporting the termination to the United States government so that her H-1B visa would be revoked.

134.    Defendant Brigitte Klaib acknowledged that one of the reasons Plaintiff's employment was terminated was that she complained about her treatment.

135.    Defendants' unlawful retaliatory actions were willful and were committed with malice and with reckless indifference to Plaintiff's rights.

136.    As a result of Defendants' conduct, Plaintiff suffered damages in an amount to be fully determined at trial.

**THIRD CLAIM FOR RELIEF**
**Retaliation Under the Colorado Wage Act**
**(C.R.S. § 8-4-120)**
**Against Defendants MCB, Kristin Scalva and Brigitte Klaib**

137.    Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs of this Complaint.

138.    Defendants MCB, Kristin Scalva and Brigitte Klaib are "employers" as defined by the Colorado Wage Act.

139.    Plaintiff engaged in protected activity under the Colorado Wage Act when she complained about Defendants' failure to pay her for all hours worked and failed to pay overtime.

140.    Defendants retaliated against Plaintiff as described above.

141.    Defendants' retaliatory actions are prohibited by the Colorado Wage Act.

142.    Defendants' retaliatory actions were willful and were committed with malice and with reckless indifference to Plaintiff's rights.

143.    As a result of Defendants' conduct, Plaintiff has suffered damages in an amount to be fully determined at trial.

**FOURTH CLAIM FOR RELIEF**
**(Breach of Contract)**
**Against Defendant MCB Research Centers**

144.    Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs of this Complaint.

145.    In the 2011 and 2014 LCAs, Defendant MCB agreed to pay Plaintiff $38.40 per hour for all hours worked and agreed to provide Plaintiff with the same benefits offered to other employees.

146.    On information and belief, Defendant MCB made substantially similar promises in written offer letters.

147.     Defendants promised to pay benefits to employees who were regularly scheduled to work 40 hours per week or more in the Personnel Manual.

148.     The LCAs, written offers of employment and Personnel Manual constitute enforceable contracts.

149.     Defendant MCB did not pay Plaintiff for thousands of hours she worked and refused to provide employee benefits in breach of these contracts.

150.     Defendant's debt to Plaintiff is evidenced in the LCAs and written offers of employment and constitutes a liquidated debt, or an unliquidated determinable amount of money.

151.     MCB's Personnel Manual contains a four-step contractual disciplinary process which requires that employees be given notice and an opportunity to correct performance problems or policy violations.  The Personnel Manual provides that "each step of the disciplinary process will be documented and acknowledged/initialed by the manager or his designate and employee."

152.     MCB's Personnel Manual does not contain any language indicating that it is not intended to be a contract or that Plaintiff's employment was at-will.

153.     Defendants breached the progressive discipline agreement set forth in the Personnel Manual as they never provided Plaintiff with any notice or opportunity to correct problems and never presented Plaintiff with any written documentation of performance problems or discipline.

154.      Defendants' breaches of contract were willful and wanton.

155.     As a result of Defendant MCB's breach of contract, Plaintiff has suffered damages in an amount to be fully determined at trial.

## FIFTH CLAIM FOR RELIEF
### (Fraud)
### Against Defendant MCB and Brigitte and Alexander Klaib

156.    Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs of this Complaint.

157.    Defendants MCB, Alexander and Brigitte Klaib induced Plaintiff to move to Colorado and work for MCB through the misrepresentations set forth in this Complaint.

158.    Defendants MCB and Brigitte Klaib withheld the 2011 and 2014 LCAs and written offer letters from Plaintiff and concealed that they had agreed to pay her $38.40 for all hours worked.

159.    Defendants MCB and Brigitte Klaib told Plaintiff that she was ineligible for employee benefits when that was not, in fact true.

160.    Defendant Alexander Klaib misrepresented to Plaintiff that she was required to repay them for the money they spent on her H-1B visa applications in order to induce her to work without pay.

161.    Defendants Brigitte Klaib and Alexander Klaib misrepresented to Plaintiff that they would sponsor her Green Card and that the hours she worked without pay would be applied to her Green Card in order to induce her to work without pay.

162.    Defendants knew these statements were false when they made them.

163.    In reliance upon these false promises by Defendants, Plaintiff relocated to Colorado, became employed by MCB, and worked without pay and benefits as alleged above.

164.    Defendants engaged in these actions willfully and with malice.

165.    As a result of Defendants fraud and deceit, Plaintiff suffered damages in an amount to be fully determined at trial.

**SIXTH CLAIM FOR RELIEF**
**(Race and National Origin Discrimination**
**(Colorado Civil Rights Act C.R.S.§ 24-34-301 *et seq*. )**
**Against Defendant MCB**

166.    Plaintiff realleges and incorporates by reference the allegations set forth in all

preceding paragraphs of this Complaint.

167.    Plaintiff is a member of a protected class as she is Black and from the Ivory Coast.

168.    Plaintiff was qualified for the job of Medical Research Coordinator with

Defendant, MCB.

169.    Plaintiff was the only non-white MCB employee.

170.    Plaintiff was the only MCB employee of Ivory Coast or African national origin.

171.    MCB required Plaintiff to work thousands of hours without pay.  It did not require

this of its white, non-African/Ivory Coast employees.

172.    MCB refused to provide Plaintiff with the same benefits provided to white, non-

African/Ivory Coast employees who worked similar hours to Plaintiff, including among others

paid days off, paid vacation, paid holidays, paid sick time, health and other insurance.

173.    MCB treated Plaintiff less favorably than her white, non-African coworkers in

other ways including forbidding her from speaking to research study participants because of her

accent, requiring her and not her white, non-African coworkers to have contact with study

participants with communicable diseases.

174.    MCB illegally discriminated against Plaintiff on the basis of race and national

origin by discharging her for pretextual reasons and replacing her with a white, non-African/Ivory

Coast employee.

175.    In its response to Plaintiff's charge of discrimination, MCB admitted that Plaintiff

satisfied the initial burden of establishing a *prima facie* case of race and national origin

discrimination, stating that Plaintiff "is a member of a protected class (race/national origin), as she is African/Black and from the Ivory Coast. She was qualified for the job of a Research Coordinator. She was discharged by MCB and her job was not eliminated after her discharge."

176.     MCB's treatment of Plaintiff was willful and malicious.

177.     As a result of MCB's illegal discrimination, Plaintiff has suffered damages to be fully determined at trial.

**SEVENTH CLAIM FOR RELIEF**
**Retaliation under the Colorado Civil Rights Act**
**(C.R.S.§ 24-34-301 *et seq*.)**
**Against Defendant MCB, Brigitte Klaib and Kristin Scalva**

178.     Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs of this Complaint.

179.     On August 10, 2016, Plaintiff complained to MCB's President, Kristin Scalva, about the discriminatory and illegal treatment alleged above.

180.     Until this meeting, MCB clearly indicated to Plaintiff that it desired and intended for her to return to work after her disability leave.

181.     Immediately after, and because of Plaintiff's complaints, Defendants Brigitte Klaib and MCB terminated Plaintiff's employment.

182.     Defendants actions constitute illegal retaliation under C.R.S. § 24-34-402(1)(e)(IV) and was willful and malicious.

183.     MCB's termination of Plaintiff's employment was in retaliation for her complaints of discrimination.

### EIGHTH CLAIM FOR RELIEF
### (Violation of C.R.S. § 24-34-402(1)(i))
### Against All Defendants MCB, Alexander and Brigitte Klaib and Kristin Scalva

184.    Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs of this Complaint.

185.    C.R.S. § 24-34-402(1)(i) makes it illegal for "an employer to discharge, discipline, discriminate against, coerce, intimidate, threaten, or interfere with any employee or other person because the employee inquired about, disclosed, compared, or otherwise discussed the employee's wages; to require as a condition of employment nondisclosure by an employee of his or her wages; or to require an employee to sign a waiver or other document that purports to deny an employee the right to disclose his or her wage information."

186.    Defendant Alexander Klaib told Plaintiff on multiple occasions that she should not discuss her wages with anyone else.

187.    In violation of C.R.S. § 24-34-402(1)(i), the MCB Personnel Manual provides that it is a violation of company policy for employees to discuss their compensation with each other.

188.    Defendants Brigitte Klaib, Kristin Scalva and MCB discharged Plaintiff because she discussed her wages with Defendant Kristin Scalva and others and complained that she was not appropriately compensated.

189.    As a result of Defendants illegal actions in violation of C.R.S. § 24-34-402(1)(i) Plaintiff has suffered damages to be proven at trial.

### NINTH CLAIM FOR RELIEF
### (Civil Rights Act of 1966, 42 U.S.C. § 1981)
### Against all Defendants

190.    Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs of this Complaint.

191.   Defendant and Plaintiff entered into a contract of employment.

192.   Defendants discriminated against Plaintiff in the enforcement of this contract on the basis of her race as alleged above, by among other actions, requiring her to work thousands of hours without compensation and withholding employee benefits from her.

193.   Defendants discriminated against Plaintiff by terminating her employment for pretextual reasons and replacing her with a white employee.

194.   Plaintiff's race was a motivating factor in Defendants' treatment of Plaintiff, enforcement of the contract and its decision to terminate Plaintiff's employment contract.

195.   Defendants acted willfully and with malice.

196.   As a result of Defendants' actions, Plaintiff has suffered damages, to be fully determined at trial.

## TENTH CLAIM FOR RELIEF
### (Retaliation - Civil Rights Act of 1866, 42 U.S.C. § 1981 *et seq*.)
### Against Defendant MCB

197.   Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs of this Complaint.

198.   Defendant terminated the contract and Plaintiff's employment because Plaintiff complained about Defendants' mistreatment of her.

199.   Defendants' actions constitute illegal retaliation.

200.   Defendants acted willfully and with malice.

201.   As a result of Defendants' actions, Plaintiff has suffered damages, to be fully determined at trial.

**ELEVENTH CLAIM FOR RELIEF**
**Disability Discrimination – Discharge**
**(Colorado Civil Rights Act C.R.S. § 24-34-301 *et seq*.)**
**Against Defendant MCB**

202.    Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs of this Complaint.

203.    Plaintiff was qualified for the job of Medical Research Study Coordinator.

204.    Plaintiff was disabled due to her cancer, surgery and treatment and subsequent complications.

205.    One of the reasons given by Defendant for Plaintiff's termination was the fact that she was required to take a medical leave of absence.

206.    Plaintiff was discharged as a result of her disability.

207.    Defendant's proffered reasons for the discharge were a pretext for discrimination

208.    Defendant replaced Plaintiff with a non-disabled individual.

209.    As a result of Defendant's discrimination, Plaintiff has suffered damages to be fully determined at trial.

**TWELFTH CLAIM FOR RELIEF**
**Disability Discrimination – Failure to Accommodate**
**(Colorado Civil Rights Act C.R.S. § 24-34-301 *et seq*.)**
**Against Defendant MCB**

210.    Plaintiff realleges and incorporates by reference the allegations set forth in all preceding paragraphs of this Complaint.

211.    At all times until August 11, 2016, Defendant accommodated Plaintiff's need for a medical leave of absence and communicated its desire to have her return to work.

212.    On August 10, 2016, Plaintiff delivered a letter from her physician clearing her to return to work in October.

213.    Defendant never told Plaintiff that it could not accommodate the additional weeks of leave or that to do so would be an undue hardship.

214.    Providing additional time off through October 2016 would have enabled Plaintiff to recover, return to work and satisfactorily perform her job.

215.    Defendant's failure to accommodate Plaintiff's disability caused her damages to be proved at trial.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial to a jury for all issues so triable.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court enter an order:

a)      Granting judgment in favor of Plaintiff and against Defendants on all claims set forth against each of them in this Complaint; and

b)      Awarding Plaintiff damages as proven at trial, including but not limited to her unpaid wages and overtime, back pay, front pay, liquidated damages, compensatory and noneconomic damages, interest as allowed by law and punitive damages; and

c)      Awarding Plaintiff her attorneys' fees, expert witness fees and all other costs and expenses of bringing this lawsuit; and

d)      Awarding Plaintiff any other relief the Court determines is just and proper.

Respectfully submitted this 17th day of July, 2019.


KIOVSKY | DUWALDT LLC


*/s Karen DuWaldt*

Karen DuWaldt (Atty Reg. # 15967)
2155 Franklin Street
Denver, CO 80205
Telephone: (720) 971-8569
Email:  karen@kdemploymentlaw.com


NIXON SHEFRIN HENSEN OGBURN, P.C.


*/s/ Stephen J. Hensen*
Stephen J. Hensen (Atty. Reg. #16893)
5619 DTC Parkway, Suite 1200
Greenwood Village, CO  80111
Telephone:  303-773-3500
Fax:          303-779-0740
Email:  shensen@nixonshefrin.com

**Attorneys for Plaintiff**